**Philip M. DINKINS, Plaintiff,**

v.

**GENERAL ANILINE & FILM CORPORATION, Defendant.**

United States District Court
S. D. New York.
Dec. 21, 1962.

See also 214 F.Supp. 281.

Barandes, Barandes & Moss, New York City, Max Barandes, New York City, of counsel, for plaintiff.

Manes, Sturim & Laufer, New York City, Arthur M. Laufer, New York City, of counsel, for defendant.

McLEAN, District Judge.

This is an action for tortious interference with contract relations. The complaint asks for (1) an injunction restraining defendant from interfering with plaintiff's right to employment with Geigy Chemical Corporation or any other corporation that may desire to employ him; (2) a declaratory judgment as to plaintiff's rights under a contract dated November 29, 1961 between plaintiff and defendant; and (3) damages in the amount of $150,000 sustained by reason of defendant's alleged interference with a contract of employment between plaintiff and Geigy Chemical Corporation dated March 9, 1962.

Plaintiff has moved for a preliminary injunction for part of this relief, i. e., for an injunction restraining defendant "from interfering with the plaintiff's right to employment with Geigy Chemical Corporation or any other corporation which may wish to employ his services." The essential facts are not disputed. I find them to be as follows.

Plaintiff is a former president of defendant. The terms of his employment were set forth in a contract between plaintiff and defendant dated March 30, 1960 which provided in substance that plaintiff would serve as president and chief executive officer of defendant for three years from June 1, 1960 to May 31, 1963, at a salary of $75,000 per year, and that thereafter for a period of ten years commencing June 1, 1963, defendant would employ plaintiff as a consultant for a compensation of $7,500 per year plus traveling expenses. The contract provided that during the entire period of the agreement, plaintiff would not "engage in or render consulting services to any business, firm or corporation whose business is directly competitive with the business of General Aniline & Film Corporation." Prior to the execution of this agreement, plaintiff had served as president of defendant beginning in November 1958. From June 1, 1955 until November 1958, he had been vice president of the Dyestuff & Chemical Division of defendant. He was a director of defendant from March 28, 1956 until December 31, 1961.

In April 1961 a new board of directors of defendant was elected and thereafter differences arose between the new board and plaintiff. Certain members of the board took the position that plaintiff should resign as president. The controversy was settled by a new agreement between the parties dated November 29, 1961 which provided that plaintiff would continue to hold his present office at his present salary until December 31, 1961,

at which date he would retire. Defendant agreed that for four years beginning January 2, 1962 it would pay to plaintiff, or to his widow or estate in the event of his death, $31,004 per year. This was in addition to plaintiff's rights under the company's retirement plan which were specifically excluded from the agreement. The agreement further provided that during the period from January 1, 1962 through December 31, 1966, "at the company's option" plaintiff would serve as a "consultant on management problems for an appropriate per diem compensation for a maximum of sixty days in each of such years." There was no provision in this agreement corresponding to that in the agreement of March 30, 1960 to the effect that plaintiff would not render consulting services to any competing corporation. The agreement of November 29, 1961 was entirely silent on this subject.

Since November 29, 1961, defendant has not availed itself of plaintiff's services as a consultant with any frequency. The moving affidavits and the complaint state, without contradiction by defendant, that defendant has called upon plaintiff on only six occasions, five of which were devoted to a discussion of the present controversy, and that plaintiff's compensation for these six conferences was less than $2,000.

On March 9, 1962 plaintiff entered into an agreement with Geigy Chemical Corporation, a competitor of defendant in the chemical and dyestuff industry. In this agreement, Geigy retained plaintiff as a "consultant on management problems and other problems involving the operation of its business" for one year from March 15, 1962 to March 14, 1963. Plaintiff agreed that during that year he would make himself available to Geigy for not less than 62 working days for the performance of such duties as might from time to time be assigned to him by Geigy. Plaintiff agreed to use his "best efforts to promote the interests of Geigy." Geigy agreed to pay plaintiff for such services $25,000, payable in installments over a period of ten years.

The agreement further provided that plaintiff would hold in a fiduciary capacity for the benefit of Geigy all information relating to the business or products of Geigy which he might acquire during the course of his work and that he would not divulge such information to anyone. It provided further that plaintiff would hold in a fiduciary capacity for the benefit of Geigy and would disclose to Geigy any inventions which plaintiff might discover or develop "solely or jointly with others, or otherwise" during the term of the agreement relating to the manufacture or sale of products in any way useful in Geigy's business.

Finally the agreement recited that plaintiff's attorneys had furnished to Geigy a summary of the contractual restrictions to which plaintiff was subject. Plaintiff represented that he had no obligations other than those referred to in this summary which would in any way restrict the services which he might perform for Geigy. It was agreed that plaintiff in the future might "negotiate further consultation commitments" provided that they did not conflict in any way with the rendering of services to Geigy.

Plaintiff was also elected a director of Geigy. The date of his election is not specified in the papers but presumably it was about March 9, 1962.

Shortly thereafter defendant learned from newspaper reports that plaintiff had become a director of Geigy and a consultant for that corporation. On April 23, 1962 members of defendant's executive committee advised plaintiff that defendant considered that plaintiff had placed himself in an "anomalous position" by accepting confidential employment with two competing companies, thereby subjecting himself, in defendant's opinion, to an "impossible burden upon him of accommodating conflicting loyalties." Subsequently, on June 28, 1962, plaintiff sent to defendant a copy of plaintiff's contract with Geigy. He stated that he had voluntarily suspended the operation of this agreement for two months but that unless defendant was

willing to discuss its objections with plaintiff and his attorney, plaintiff intended to resume operations in the near future.

On July 19, 1962, Geigy's attorney wrote to defendant stating that he had been advised by plaintiff of plaintiff's various conferences with defendant concerning defendant's objections to the Geigy contract. The letter stated that Geigy did not believe that this contract would "involve the disclosure to Geigy of any information or data concerning or belonging to General Aniline," but that nevertheless Geigy did not desire to have any dispute with General Aniline and hoped that misunderstandings could be avoided by a conference on the subject. To this letter defendant replied on July 24, 1962 stating:

"General Aniline like Geigy dislikes controversy but we cannot see how Mr. Dinkins, as our former chief executive and now under contractual obligation to act as a consultant to us, can at the same time undertake to fulfill his duties as your consultant and director without violating the fiduciary obligations inherent in both of his situations."

Geigy's attorney again suggested a conference but defendant in effect refused to discuss it further. This ended the correspondence. Defendant's affidavits state, without contradiction, that there were no other communications, oral or written, between defendant and Geigy on this subject.

On August 28, 1962, Geigy's president wrote to plaintiff quoting the sentence from defendant's letter of July 24, 1962 above set forth and stating that under the circumstances, Geigy felt that plaintiff should no longer continue as a member of its board of directors and that the consulting agreement should be terminated. The president expressed his regret at this situation and concluded his letter by saying:

"I look forward to reexamining the possibility of reinstating these arrangements, once matters have been clarified with General Aniline."

Apparently no such "reexamination" has occurred.

There is no claim in the moving papers that any other corporation presently desires to retain plaintiff as a consultant.

An important factor to be considered by the court in deciding whether to grant the drastic remedy of a preliminary injunction is the probability of plaintiff's ultimate success in the action after a trial on the merits. The degree of importance to be attributed to this factor has been variously expressed in the decisions. It has been said that before granting this interlocutory relief, the court must be "convinced beyond doubt" that plaintiff will ultimately succeed. Willheim v. Murchison, 203 F. Supp. 478 (S.D.N.Y.1962).

It has also been said that plaintiff's success must be "clear beyond dispute." Huber Baking Co. v. Stroehmann, 114 F.Supp. 411 (S.D.N.Y.1953); aff'd 208 F.2d 464 (2d Cir., 1953).

Other courts have stated the rule somewhat less stringently as requiring a "reasonable certainty" of plaintiff's success. Nadya Inc. v. Majestic Metal Specialties, Inc., 127 F.Supp. 467 (S.D.N.Y.1954).

On occasion the court has contented itself with stating that a "clear" showing is necessary. Spitz, Inc. v. Dill, 140 F. Supp. 947 (S.D.N.Y.1956).

No doubt the degree varies somewhat in accordance with the showing that has been made as to other important factors to be considered, i. e., the extent and irreparability of the injury to plaintiff if the injunction is denied, the extent of injury to defendant if it is granted, and the question of whether the relief sought by temporary injunction is all or a substantial part of the final relief demanded in the complaint. But at the least, the balance of these other factors would need to be heavy in plaintiff's favor to justify the granting of a preliminary injunction in a case where plaintiff's ultimate success is uncertain or less than clear.

The present case in my opinion falls within the "uncertain" category. It will be observed that all that defendant did, as far as appears on this motion, was to state its opinion that plaintiff would violate his fiduciary obligation to defendant under his contract with it if he were simultaneously to assume a fiduciary obligation to a competitor. Defendant did not seek out its competitor, Geigy, to put it on notice of defendant's views. It expressed them in response to an inquiry from Geigy's lawyer. Although defendant's letter made plain its displeasure at the situation, it did not threaten suit.

Section 773 of the Restatement of Torts (1939) lays down this proposition:

"One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction."

This principle has been applied in a variety of factual situations in cases sometimes involving preliminary injunctions. In Kaplan v. Helenhart Novelty Corp., 182 F.2d 311 (2d Cir., 1950), plaintiff sued for a judgment declaring defendant's patent invalid, and for damages for unfair competition. Defendant had threatened to sue plaintiff for infringement and had told plaintiff's customers that he proposed to sue. The District Court granted a preliminary injunction. The Court of Appeals reversed. The court said (182 F.2d 311 at 314):

"* * * it is not an actionable wrong for one in good faith to make plain to whomsoever he will that it is his purpose to insist upon what he believes to be his legal rights, even though he may misconceive what those rights are."

The court held that there was no substantial evidence to show that defendant did not believe in good faith that its patent was valid and that it had been infringed.

A similar result was reached in Eastern States Petroleum Co., Inc. v. Asiatic Petroleum Corporation, 103 F.2d 315 (2d Cir., 1939), where the interest which defendant was trying to protect was a property right in oil rather than in a patent. And the doctrine was applied to contract rights in Hendler v. Cuneo Eastern Press, Inc., 279 F.2d 181 (2d Cir., 1960). There defendant, a printer, had a contract for the printing of magazines published by Farrell Publishing Corp. Farrell repudiated the contract and began negotiations with another printer, The Rumford Press, to print the magazines. Defendant wrote to The Rumford Press stating that it would bring an action against it for interference with contract relations if The Rumford Press proceeded to print Farrell's magazines. Farrell went into bankruptcy and its trustee made a claim against defendant for interference with contract relations. Judgment dismissing the claim of the trustee was affirmed. The court cited Section 773 of the Restatement quoted above and held that defendant had a "legally protected interest" which it believed might be impaired by the proposed contract between Farrell and The Rumford Press and that therefore the rule of that section applied.

It is clear from these decisions that if defendant in good faith believed that its contract with plaintiff prevented plaintiff from acting as a consultant to Geigy, defendant committed no actionable wrong in saying so. There is no substantial evidence on this motion to show that defendant was not acting in good faith. It is true that the contract between the parties dated November 29, 1961, unlike their previous contract, did not expressly prohibit plaintiff from acting for a competitor. But such a prohibition may well have been an implied term. Sapery v. Atlantic Plastics Inc., 258 F.2d 793 (2d Cir., 1958), is of interest in this connection. There defendant had contracted to pay plaintiff, a

manufacturer's representative, commissions on orders obtained by him for defendant and commissions on reorders for the same item. Plaintiff decided to go into business for himself manufacturing products similar to defendant's. There was no restriction in the contract which prevented plaintiff from setting up a competing business. Defendant nevertheless terminated the contract. Plaintiff sued for damages and an accounting. The Court of Appeals held that defendant was entitled to terminate the contract. It said (258 F.2d 793 at 795):

"There is no express provision allowing the agent to compete with his principal, and if plaintiff is to prevail, it would be only on the theory that such a provision must by necessary implication be read into the contract. The law, however, is exactly to the contrary."

And again on page 796:

"When plaintiff went into the manufacturing business he had 'an interest against his duty.' Nor can he complain since he 'voluntarily put himself in an attitude hostile to his master's interest.'"

Obviously, I am not called upon to predict at this time how this litigation will eventually turn out. Suffice to say that the outcome is far from clear.

As far as irreparable injury to plaintiff is concerned, the showing made by the moving papers is less than convincing. Plaintiff's contract with Geigy has already been terminated, and it seems highly unlikely that any decision in this case, short of a final judgment for plaintiff, would revive it. Indeed, Geigy is not committed to reinstate the contract even in that event. As far as appears, no other consulting contracts for plaintiff are in the immediate offing. Plaintiff, of course, still has his claim for money damages. It is difficult to see why preliminary injunctive relief is necessary for his protection.

An injunction at this stage would, however, work a hardship upon defendant. Its only act of "interference" has been the voicing of its opinion as to its legal rights. An injunction would necessarily prohibit it from so doing until the final disposition of this action. Such an injunction would constitute a substantial part of the relief demanded in the complaint. In view of the fact that plaintiff's right to that relief is uncertain, and the danger of irreparable injury to him during the pendency of this action is slight, I conclude that defendant should not be so restricted. Motion denied. So ordered.

