The **FRANKLIN MINT, INC.**

v.

**FRANKLIN MINT, LTD.**

**Civ. A. No. 71–329.**

United States District Court,
E. D. Pennsylvania.

March 11, 1971.

As Amended Oct. 13, 1971.

**828**

Arthur H. Seidel, Philadelphia, Pa., for plaintiff.

Samuel P. Lavine, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

GORBEY, District Judge.

This cause came to be heard February 22, 1971, on plaintiff's motion for a preliminary injunction. Prior thereto, an ex parte temporary restraining order was issued on February 10, 1971, and a ten day extension thereof was granted on February 22, 1971.

Plaintiff has alleged statutory trademark infringement, Lanham Trade-Mark Act, § 32(1), 15 U.S.C.A. § 1114(1); common law unfair competition; statutory unfair competition, Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125 (a).

Defendant did not appear either personally or by counsel at the hearing on plaintiff's motion for preliminary injunction, and upon review of the record and consideration of plaintiff's memorandum of law, proposed findings of fact and con-clusions of law, the Court makes the following:

## FINDINGS OF FACT

1. Plaintiff, The Franklin Mint, Inc., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, having its principal place of business at Franklin Center, Pennsylvania.

2. Defendant, Franklin Mint, Ltd., is a corporation organized and existing under the laws of England, having a place of business at 92 Oldfield Road, Sutton, Surrey, England.

3. Defendant received notice of this hearing on February 13, 1971, when its managing agent was personally served at the above address with the following documents: plaintiff's verified complaint; plaintiff's petition to make service upon the Secretary of the Commonwealth of Pennsylvania; an order directing the Marshal to make service upon the Secretary of the Commonwealth of Pennsylvania; plaintiff's motion for a temporary restraining order; the temporary restraining order; plaintiff's motion for a preliminary injunction; and an order setting down the day and time for a hearing on plaintiff's motion for said preliminary injunction.

4. Service upon the defendant was had by transmitting to the Secretary of the Commonwealth of Pennsylvania and to the defendant at its place of business, by registered mail, return receipt requested, a copy of the summons and the complaint, together with a copy of plaintiff's petition to make service upon the Secretary of the Commonwealth and the order granting said petition.

5. In 1964, plaintiff was incorporated in Pennsylvania and began doing business as General Numismatics Corp. Shortly thereafter and prior to 1965, the plaintiff commenced trading as THE FRANKLIN MINT.

6. Plaintiff has used the mark, THE FRANKLIN MINT, in interstate commerce continuously since approximately 1965 on or in connection with coins,

tokens, medals, medallions, fine art products, and precious metal ingots.

7. Since the beginning of 1965, plaintiff has used THE FRANKLIN MINT in all of its financial reports, collateral literature, and publicity materials. Further, the mark, THE FRANKLIN MINT, was and is the focus of plaintiff's advertising which since 1965 has totaled approximately six million three hundred thousand dollars, increasing from ten thousand dollars in 1965 to over three million dollars in 1970.

8. The following marks were registered by plaintiff on the principal register in the United States Patent Office on the dates set forth below:

| Trademark | Registration no. | Registration date |
|---|---|---|
| The Franklin Mint | 871,805 | 6/24/69 |
| The Franklin Mint | 873,945 | 7/29/69 |
| The Franklin Mint | 875,401 | 8/19/69 |
| The Franklin Mint | 875,401 | 8/19/69 |
| The Franklin Mint (and Design) | 881,072 | 11/18/69 |
| The Franklin Mint (and Design) | 881,073 | 11/18/69 |
| The Franklin Mint Almanac | 894,633 | 7/14/70 |
| The Franklin Mint The World's Foremost Private Mint | 902,335 | 11/10/70 |
| The Franklin Mint The World's Foremost Private Mint | 902,755 | 11/17/70 |

9. On May 20, 1968, plaintiff's corporate name was changed from General Numismatics Corp. to THE FRANKLIN MINT, INC.

10. Plaintiff's annual sales volume for the period 1965 to 1970 was approximately eighty-eight million dollars, increasing from three hundred ninety-one thousand dollars in 1965 to forty-five million dollars in 1970.

11. Plaintiff employs approximately seventy persons directly engaged in quality insurance activities, in addition to which an extensive research and development department continuously seeks methods of maximizing quality of the product. One aspect of this quality is that the characteristics and distinguishing features of individuals are well sculpted and delineated. Plaintiff has received numerous awards for the quality of its products.

12. One of plaintiff's methods of doing business is by direct mail advertising and presently there are about three different mailings per month emanating from The Franklin Mint, Inc. Such mailings vary in circulation from twenty thousand to as many as two million five hundred thousand people. Plaintiff also advertises in a wide variety of publications, many of which are circulated in England. Plaintiff has in excess of three hundred thousand established customers.

13. In addition to its own direct mailings, plaintiff also engages in cooperative marketing programs and has participated with the following firms in marketing a particular set or edition of coins or medals: American Express, Encyclopedia Britannica, Standard Oil Company, The United Nations Association of the United States and The National Trust for Historic Preservation.

14. Plaintiff often issues coins in a series. For example, The Roberts Byrd Series, The Roberts Zodiac Series, *The Franklin Mint* Presidential Series, Societe Commemorative de Femmes Celebres, etc. Presently, plaintiff is producing a series for the American Negro Commemorative Society, two of the medals in this series being the Thomas "Fats" Waller Medal which was issued in March, 1970, and the Bessie Smith Medal which was issued in January, 1971.

15. Since 1964, plaintiff has minted in excess of one billion coins and has sold these coins throughout the United States and in sixty other countries. Plaintiff has subsidiaries in England, Canada and France.

16. Through plaintiff's extensive sales, its expansive advertising and promotional efforts, and the high quality of its product, the plaintiff's trademark/trade name has become well and

favorably known to the general public and trade to identify the plaintiff's goods, and they identify the source and origin of the plaintiff's goods and represent substantial goodwill.

17. In January, of 1971, the defendant offered a coin product for sale in the Commonwealth of Pennsylvania. Said offer was made by mailing into Pennsylvania, from Surrey, England, a brochure and a sample coin. This act was defendant's initial act of doing business in the Commonwealth. The brochure consists of four pages and offers for sale a Louis Armstrong Commemorative Medallion. On the first page of the brochure is a photograph of Louis Armstrong, while on the second, there is a photograph of the obverse and reverse of the commemorative medallion. The obverse purports to show a likeness of Louis Armstrong, while the reverse shows a trumpet and handkerchief. The third page gives pricing and ordering information, while the fourth page prominently displays the designation, THE FRANKLIN MINT, LTD., which designation was also prominently displayed on the sample coin.

18. The likeness of Louis Armstrong presented on the obverse of the medallion in the aforesaid brochure does not show the characteristics and distinguishing features when compared to the photograph on page one of said brochure. Said likeness would not be acceptable for production by plaintiff.

19. Defendant advertised the said Louis Armstrong commemorative medallion in the March, 1971 edition of *Coins*, a magazine for coin collectors. Plaintiff also advertised in the same edition of *Coins*. Both advertisements appeared on page 32 of the said magazine.

20. Plaintiff did not consent to any of the aforementioned acts of defendant.

21. Plaintiff first became aware of defendant's activities in Pennsylvania in the latter part of January, 1971, when the aforementioned brochure and sample coin were called to its attention.

22. The president and chief executive officer of The Franklin Mint, Inc., upon seeing said advertisement, immediately contacted the ·Numismatic editor of *Coins*. The two advertisements were published in the fashion described aforesaid because the individual preparing the advertising believed that the advertisement for the Louis Armstrong Commemorative Medallion originated from an England based marketing division of plaintiff.

## DISCUSSION

It is axiomatic that in order to issue a preliminary injunction in an unfair competition case, it is necessary to show irreparable harm to the moving party if such does not issue and the likelihood of said moving party's success at trial on the merits.

## IRREPARABLE INJURY

Even if defendant matches the high quality of plaintiff's products (and, indeed, the contrary appears to be true— findings of fact 18), plaintiff is still entitled to have his reputation within his control. Ambassador East, Inc. v. Orsatti, Inc., 257 F.2d 79, 82 (3d Cir. 1958). By depriving plaintiff of the ability to control the nature and quality of defendant's goods, defendant inflicts serious harm upon plaintiff. This deprivation, without more, constitutes irreparable injury. Callmann, Unfair Competition Trademarks and Monopolies (3d Ed.), § 88.3(b), pp. 205 and 206. However, in this case there is much more. Plaintiff also faces the probability of loss of trade, the value of which may be impossible to ascertain. Even more serious is the probable damage to plaintiff's goodwill, an intangible value which can never accurately be ascertained. Chips 'N Twigs, Inc. v. Blue Jeans Corp., 146 F.Supp. 246, 248 (E.D.Pa.1956). Thus, plaintiff could never accurately be compensated for such loss.

## LIKELIHOOD OF SUCCESS

1. *Trademark Infringement.* Lanham Trade-Mark Act, § 32(1), 15 U.S.C.A. § 1114(1).[1]

■ In light of the findings of fact, *supra*, very little discussion of trademark infringement is indicated. The test of trademark infringement is likelihood of confusion or probable confusion, not actual confusion. Telechron, Inc. v. Telicon Corp., 97 F.Supp. 131, 142 (D.Del. 1951), aff'd 198 F.2d 903 (3d Cir. 1952). The judicial yardstick used by this circuit to measure likelihood of confusion is that set forth in the Restatement of the Law of Torts, § 729. Sears, Roebuck & Co. v. Johnson, 219 F.2d 590, 592 (3d Cir. 1955). Of the factors set forth in the Restatement, only one need concern us here and that is the degree of care likely to be exercised by purchasers. Were we dealing only with experts, that is, collectors, dealers and others with a high degree of numismatic knowledge, there might be a serious question as to whether likelihood of confusion could be established. However, we need not concern ourselves with this consideration because of plaintiff's extensive and successful mass media and direct mail advertising aimed at the layman and its cooperative marketing program which, of necessity reaches many laymen. (findings of fact 7, 12, 13)

2. *Common Law and Unfair Competition.* Because trademark infringement is but one aspect of the broader field of unfair competition, Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 413, 36 S.Ct. 357, 360, 60 L.Ed. 713, 718 (1916); Villager, Inc. v. Dial Shoe Company, 256 F.Supp. 694, 702 (E.D.Pa. 1966), and facts supporting a suit for trademark infringement and a suit for unfair competition are substantially identical, Villager, Inc. v. Dial Shoe Company, *supra* at 703, plaintiff's likelihood of success on this issue is closely linked to that of statutory trademark infringement.

Assuming arguendo that plaintiff's trademark/trade name is descriptive and requires secondary meaning, such requirement follows *a fortiori* from findings of fact 10, 12, 13, 16.

3. *Statutory Unfair Competition.* Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).[2]

■ That § 43(a) of the Lanham Act gives rise to a distinct federal statutory tort is well settled in this circuit. L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., 214 F.2d 649, 651 (3d Cir. 1954). Further, the word, origin, as used in §

---

1. "Any person who shall, without the consent of the registrant—

"a. Use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

"b. Reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive * * *"

2. "Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

43(a) refers not only to geographic origin but also to source origin. Federal-Mogul-Bower Bearings, Inc. v. Azoff, 313 F.2d 405, 408 (6th Cir. 1963); Eastman Kodak Co. v. Royal-Pioneer Paper Box Mfg. Co., 197 F.Supp. 132, 135 (E.D.Pa. 1961).

Before proceeding to the conclusions of law, we might briefly note that in balancing the equities, defendant has very little on his side of the scale in light of the fact that he has just recently begun doing business in the Commonwealth of Pennsylvania in what appears to be a rather blatant attempt at counterfeiting.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action by virtue of 28 U.S.C.A. § 1338(a) and 15 U.S.C.A. § 1121 (statutory trademark infringement); 28 U.S.C.A. § 1338(b) (pendent jurisdiction of unfair competition); 15 U.S.C.A. § 1125 (a) and (b) (statutory unfair competition and importation of goods in violation of the Federal Unfair Competition Statute); and because of diversity of citizenship with the amount in controversy exclusive of interest and cost being in excess of ten thousand dollars.

2. Defendant is doing business within the Commonwealth of Pennsylvania and venue is proper (28 U.S.C.A. § 1391(c)).

3. Personal jurisdiction over the defendant exists by virtue of Pennsylvania's Business Corporation Law § 1011 (1933), 15 P.S. § 2011, subd. C (pocket part 1971), amending 15 P.S. § 2011 (1967).

■ Service under 15 P.S. § 2011, subd. B (1967) satisfies the requirements of Fed.R.Civ.Proc., Rules 4(d) (3) and 4(d) (7), 28 U.S.C.A. Long-arm Statute satisfies the requirements of Fed.Rules Civ.Proc. rule 4(d), 28 U.S.C.A.

5. The notice provided to defendant satisfies the requirements of Fed.Rules Civ.Proc. rule 65(a) (1), 28 U.S.C.A.

6. Plaintiff is the owner of the United States trademark registrations set forth in findings of fact 8.

7. Upon trial on the merits, there is an overwhelming likelihood that plaintiff will prevail on the causes of statutory trademark infringement, common law unfair competition, and statutory unfair competition.

8. Unless a preliminary injunction issues, plaintiff will suffer irreparable harm pending a determination of this claim on the merits.

9. Plaintiff, having made a clear showing of a violation of the Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125, is entitled to the prohibition provided for by the Lanham Trade-Mark Act, § 43(b), 15 U.S.C.A. § 1125(b).[3]

10. This action was timely instituted.

11. The plaintiff's trademark/trade name has become well and favorably known to the general public and trade to identify the plaintiff's goods, and they identify the source and origin of the plaintiff's goods and represent substantial goodwill.

## ORDER

■ And now, this 11th day of March, 1971, conditioned upon plaintiff giving security approved by the Court in the amount of five thousand dollars ($5,000) for the payment of such costs and damages as may be incurred and suffered by any person, firm, corporation or association which is found to have been wrongfully enjoined or restrained, it is hereby ordered:

That defendant, Franklin Mint, Ltd., its directors, officers, agents, servants, employees and attorneys, and all those acting otherwise in privity or in concert

3. "Any goods marked or labeled in contravention of the provisions of this section shall not be imported into the United States or admitted to entry at any custom house of the United States. The owner, importer, or consignee of goods refused entry at any custom house under this section may have any recourse by protest or appeal that is given under the customs revenue laws or may have the remedy given by this chapter in cases involving goods refused entry or seized."

with defendant be and they are hereby restrained and enjoined pending the determination of this action from doing, aiding, causing or abetting any of the following insofar as the same affects commerce which may be lawfully regulated by congress:

1. Directly or indirectly infringing, or contributorily infringing upon plaintiff's trademark and/or trade name THE FRANKLIN MINT.

2. Directly or indirectly using plaintiff's trademark and/or trade name THE FRANKLIN MINT in connection with coins, tokens, medals, medallions, fine art products, and precious metal ingots, similar or related goods, or from using any words or letters which in any way simulate the trademark and/or trade name THE FRANKLIN MINT or any other letters or designs which in any way simulate plaintiff's trademark and/or trade name THE FRANKLIN MINT.

3. Engaging in any acts or activities directly or indirectly calculated to trade upon the name, reputation or goodwill of plaintiff or in any manner to palm off defendant's goods as those of plaintiff's.

4. Importing into the United States and/or using in the manufacture, sale, offering for sale, promoting, advertising, marketing and distributing of coins, tokens, medals, medallions, fine art products, and precious metal ingots, similar or related goods, or on any packages, cartons, labels, display cards, wrappers or any advertising matter whatsoever, the trademark and/or trade name THE FRANKLIN MINT in such manner as to feature said trademark and/or trade name or to deceive or to tend to deceive the purchasing public into the belief that the goods manufactured and sold by the defendant are the goods manufactured and/or sold by the plaintiff.

5. Importing into the United States and/or using in the manufacture, sale, offering for sale, promoting, advertising, marketing and distributing of coins, tokens, medals, medallions, fine art products, and precious metal ingots, similar or related goods, or on any packages, cartons, labels, display cards, wrappers

or any advertising matter whatsoever, the trademark and/or trade name THE FRANKLIN MINT in such manner as to deceive or to tend to deceive or to falsely designate the origin or to falsely describe or represent a source of the goods or otherwise to create confusion among the purchasing public as to the source of origin of defendant's goods.